1
2
3
4
5
6
7
8

9                       UNITED STATES DISTRICT COURT

10                      SOUTHERN DISTRICT OF CALIFORNIA

11

12   VAL J. WALDON,                          Case No.:  15cv631 AJB (NLS)

13                            Plaintiff,     **REPORT AND**
                                             **RECOMMENDATION FOR ORDER:**
14   v.

15   CAROLYN W. COLVIN, Acting              **(1) GRANTING PLAINTIFF'S**
     Commissioner of Social Security,       **CROSS MOTION FOR SUMMARY**
16                                          **JUDGMENT [Dkt. No. 16]; and**
                             Defendant.
17
                                            **(2) DENYING DEFENDANT'S**
18                                          **CROSS MOTION FOR SUMMARY**
                                            **JUDGMENT [Dkt. No. 20].**
19

20

21

22

23          Plaintiff Val Waldon brings this action under the Social Security Act, 42 U.S.C. §

24   405(g), seeking judicial review of the final decision of the Commissioner of the Social

25   Security Administration ("Commissioner" or "Defendant") denying his claim for social

26   security benefits.  This case was referred for a report and recommendation on the parties'

27   cross motions for summary judgment.  See 28 U.S.C. § 636(b)(1)(B).  After considering

28   the moving papers, the administrative record, and the applicable law, the court

                                             1

1  **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED** and the

2  case be reversed and remanded to the Social Security Administration for the calculation

3  of the award of benefits, and that Defendant's cross motion for summary judgment be

4  **DENIED**.

5      **I.**    **BACKGROUND**

6        **A. Procedural History.**

7       Waldon filed applications for a period of disability and social security disability

8  insurance benefits (SSD) on August 27, 2008.  Administrative Record (AR) 174-184.  He

9  alleges his condition rendered him unable to work on March 1, 1997.  *Id.*  An

10  Administrative Law Judge (ALJ) held hearings on April 12 and August 30, 2010.   AR

11  59-67, 34-58.  Waldon testified at the April hearing.  AR 59-67.  Waldon, medical expert

12  Arvin Klein, and vocational expert John Kilcher testified at the August hearing.  AR 34-

13  58.  Based on the testimony and documentary evidence the ALJ issued a decision

14  denying Waldon's application for benefits.  AR 18-33.  Waldon filed an administrative

15  request to review the decision.  AR 16-17.  The Appeals Council denied the request for

16  review, and the ALJ's decision became final.  AR 1-6.

17       Waldon then filed a complaint for judicial review in this court.  This court found

18  legal error in the ALJ's decision and reversed and remanded for further proceedings.  AR

19  1033-1058.  An ALJ held another hearing on October 14, 2014.  AR 956-999.  On

20  November 20, 2014, the ALJ again determined that Val Waldon was not disabled.  AR

21  897-919.

22        **B. Order Remanding this Action.**

23       In this court's Report and Recommendation for Waldon's first appeal ("R&R 1"),

24  it found that the ALJ's denial of benefits was unsupported because he did not cite clear

25  and convincing evidence to reject either the opinion of Waldon's treating physician for

26  10 years, Dr. Sprague, or Waldon's own testimony.  The court ordered the ALJ, on

27  remand, to properly consider the entire record when weighing the opinion of Dr. Sprague

28  and the testimony of Mr. Waldon.  *See Waldon v. Astrue*, 12cv1323 AJB (NLS).

## C. **Medical Evidence:  Treating Physician Dr. Carol Sprague.**

Waldon has a history of insulin dependent diabetes mellitus, hypertension, depression, post traumatic stress disorder, substance, alcohol and Vicoden abuse, asthma, coronary artery disease, myocardial infarction, peripheral neuropathy, cerebrovascular accident in 1996 with right lower extremity weakness, gastroesophageal reflux disease, and hypoglycemia.  AR 23, 240-286, 380-851, 853-896.  Those diagnoses are based on reports from several physicians.  *See* R&R 1, pp.2-3.  The ALJ found that during the time period in question, Waldon had severe diabetes mellitus, hypertension and substance abuse disorder.  AR 26.

One of the two major issues in this appeal concerns the opinion of Dr. Carol Sprague from the Veterans Affairs Medical Center, who treated Waldon from December 2000 through March 2009.  AR 289-348; 380-852.  She diagnosed him as suffering from diabetes with significant peripheral neuropathy in his feet, significant numbness in his thighs with severe pain (meralgia paresthetica), distant history of a stroke with chronic right lower extremity numbness and mild weakness, high blood pressure, high cholesterol, obstructive sleep apnea, obesity, depression and PTSD symptoms.  AR 852.  She noted he takes the following medications: metformin, insulin, simvastatin, metoprolol, losartan, doxazosin, pantoprazole, testosterone, duloxetine, amitriptyline, trazodone and methadone.  *Id.*

### D. **Waldon's Testimony.**

At the first set of hearings, Waldon testified that various impairments prevented him from working since at least 1997.  AR 26, 43-51.  He testified that he broke his right wrist and had three operations on it.  AR 26.  While recovering from his wrist injuries he had a stroke followed by right sided weakness.  AR 26, 43.  He has used a cane since the late 1990s due to weakness on his right side.  AR 41, 45.  While he was treated at UCSD for the stroke, those records are no longer available.  AR 43, 65-66.

Waldon was insulin-dependent due to his 1993 diagnosis of diabetes.  AR 26.  Diet and medicine helped his diabetes.  AR 26.  He stopped using cocaine in 1999, after he

was incarcerated.  AR 26.  Waldon said that he could not sustain an eight hour workday and 40 hour workweek due to his energy level and medication levels.  AR 26.  He said he could perform a full range of work with these nonexertional limitations: mild restrictions of activities of daily living, moderate difficulties maintaining social functioning, and mild difficulties maintaining concentration, persistence or pace, and the need to avoid hazards. AR 25.

### E.  Residual Functional Capacity.

After the first set of hearings, the ALJ concurred with RFC assessment by Dr. Klein, the state's medical expert, and found that Waldon "had no exertional limitations and no postural limitations and is able to sit for six hours, stand for six hours, and walk for six hours in an eight hour workday, but should avoid hazards."  AR 27-28.  After the hearing on remand, the ALJ changed the RFC and limited Waldon to perform sedentary work, except that he could lift and carry up to 10 pounds at one time, and never more. AR 905.  He also found that he can sit for six hours in an eight hour work day, and can stand or walk for two hours in an eight hour work day.  AR 905.

### F.  The ALJ's Decision.

#### 1.  Evaluating Social Security Disability Claims.

To qualify for disability benefits under the SSA, an applicant must show that he or she cannot engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least 12 months.  42 U.S.C. §423(d).  The Social Security regulations establish a five-step sequential evaluation for determining whether an applicant is disabled under this standard.  20 C.F.R. § 404.1520(a); *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004).

At Step 1, the ALJ determines whether the applicant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(I).  At Step 2, the ALJ determines whether the applicant suffers from a "severe" impairment within the meaning of the regulations. 20 C.F.R. § 404.1520(a)(4)(ii).  If the impairment is severe, the ALJ goes on to Step 3 to

4

decide whether the impairment meets or equals one of the "Listing of Impairments" in the Social Security regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If it does, the applicant is found disabled, and benefits are awarded.  *Id.*  If the impairment does not meet or equal a Listing, the ALJ goes on to Step 4 to determine whether the applicant retains the residual functional capacity to perform his or her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the applicant cannot perform past relevant work, the ALJ–at Step 5–must consider whether the applicant can perform any other work that exists in the national economy.  20 C.F.R. § 404.1520(a)(4)(v); *Kennedy v. Colvin*, 738 F.3d 1172, 1175 (9th Cir. 2013); *see Garrison v. Colvin*, 759 F.3d 995, 1010-11 (9th Cir. 2014) (discussing the sequential process in greater length).

While the applicant carries the burden to prove eligibility at Steps 1 through 4, the burden at Step 5 rests on the agency.  *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).  Applicants not disqualified at Step 5 are eligible for disability benefits.  *Id.*

### 2.  Substance of ALJ Decision.

The ALJ again determined that Waldon satisfied Step 1 of the evaluation because he met the insured status requirement of the Social Security Act through June 30, 2002 and had not engaged in substantial gainful activity since March 1, 1997, the disability onset date.  AR 903.  At Step 2, the ALJ found that Waldon suffered from the following "severe" impairments as defined in the regulations: diabetes mellitus; peripheral neuropathy; history of cerebrovascular accident; gastroesophageal reflux disease; hypertension; dyslipidemia; right knee pain; possibly osteoarthritis and a history of alcohol and cocaine dependence.  AR 903.  He found that these impairments "cause more than a slight limitation of the claimant's physical or mental ability to do basic work activities[.]"  AR 903.  The ALJ also found that Waldon's post-traumatic stress disorder (PTSD) was non-severe and did not cause more than a minimal limitation in his ability to perform basic mental work activities.  AR 903.

Moving on to Step 3, the ALJ found Waldon did not suffer from an impairment or combination of impairments that met or medically equaled one of the impairments in the

Social Security Regulations.  AR 905; see 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.  The ALJ noted these findings: in a December 1, 2000 visit to the Veterans' Affairs Medical Center, Waldon had not experienced symptoms of PTSD nor received treatment for it in the previous year; and at medical appointments in 1998 and in 2001 and at the hearing before the ALJ, Waldon gave conflicting stories on his military service, combat history and source of PTSD, which the ALJ attributed to dishonesty rather than any other cause.  AR 903-904.  The ALJ then went on to address the four elements of the "paragraph B" criteria to evaluate mental disorders.  He found that Waldon could perform all his activities of daily living; had only mild limitations in social functioning; and had only mild limitations in concentration, persistence and pace; and had not experienced any extended periods of decompensation.  AR 904-905.

In determining—at Step 4—whether Waldon retained the RFC to perform his past relevant work as a sheet metal production worker, truck driver or retails sales clerk, bank teller, the ALJ, relying on the opinion of the vocational expert, concluded that Waldon could not perform any of his past relevant work.  AR 912.

At Step 5, the ALJ considered Waldon's RFC, age, education, work experience and RFC, all in conjunction with the medical-vocational guidelines, and found that he could successfully adjust to other work that exists in significant numbers in the national economy.  AR 913.  Some of the representative jobs include table worker and final assembler of optical goods.  AR 913.

## II.    DISCUSSION

Waldon asserts the same challenges here as he did in his first appeal.  He argues that the ALJ erred by failing to (1) give clear and convincing reasons for rejecting the opinions of Dr. Sprague, Waldon's treating physician for 10 years; and (2) give clear and convincing reasons for rejecting Waldon's testimony.  These are the same two points that this court ordered the ALJ to address on remand.

/ / /

/ / /

### A. Is There Substantial Evidence to Support the ALJ's Decision to Reject Dr. Sprague's Opinion?

The Social Security Act provides for judicial review of a final agency decision denying a claim for disability benefits. 42 U.S.C. § 405(g). A reviewing court must affirm the denial of benefits if the agency's decision is supported by substantial evidence and applies the correct legal standards. *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001) (citation omitted). Put another way, it is "more than a scintilla but less than a preponderance." *Thomas v. Barnhart,* 278 F.3d 947, 954 (9th Cir. 2002). If the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld. *Id.; Batson*, 359 F.3d at 1193. Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are the exclusive functions of the agency. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). The reviewing court cannot reinterpret or re-evaluate the evidence however much a re-evaluation may reasonably result in a favorable outcome for the plaintiff. *Batson*, 259 F.3d at 1193.

In the first appeal, the ALJ rejected Dr. Sprague's opinion that Waldon was "'disabled', 'unable to work' [and] can or cannot perform a past job because they 'are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein and in the Dictionary of Occupational Titles.'" R&R 1, p.10 (quoting AR 27). The only other reasons offered for rejecting Dr. Sprague's opinion was reliance on the opinions of reviewing Drs. Steinberg, Hoskins, Klein and Tyutyulkova, who were "non-treating and non-examining physicians who did not have any relationship with Waldon and simply reviewed his medical records." R&R 1, p.13. On remand, this court ordered the ALJ to "provide due consideration to Dr. Sprague's findings and opinions with regard to these impairments:

7

diabetes, high blood pressure (hypertension), substance abuse,[1] significant numbness in thighs with severe pain (meralgia paresthetica), obstructive sleep apnea, obesity, depression and PTSD." R&R 1, pp.13-14.

### 1. Legal Standard for Rejecting Treating Physician Testimony.

Where a treating doctor's opinion is not contradicted by another doctor, the commissioner can only reject the treating doctor's opinion for "clear and convincing" reasons. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Where the treating doctor is contradicted by another doctor, the commissioner must provide "specific and legitimate" reasons based on "substantial evidence" to properly reject a treating physician's opinion. *Id*. at 830-831. The opinion of an examining physician alone can constitute "substantial evidence" because it rests on an independent examination. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). Moreover, "When confronted with conflicting medical opinions, an ALJ need not accept a treating physician's opinion that is conclusory and brief and unsupported by clinical findings." *Id*. Finally, the "ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008.)

Here, Waldon received his medical treatment through the VA. Dr. Sprague was his primary care physician at the VA for 10 years and referred him out to specialists. There are no other treating doctors or consultative examinations cited to in the record. As explained in R&R 1, this court found that the ALJ's reasons to reject Dr. Sprague's opinion based on the opinions of the Commissioner's examining doctors did not constitute substantial evidence to support the ALJ's initial decision. Now, because Dr. Sprague's opinion is not contradicted by another doctor, the Commissioner can reject her opinion only for clear and convincing reasons.

---

[1] The court notes that the ALJ already determined that Waldon suffers from diabetes, high blood pressure and substance abuse, and asked the ALJ to reconsider the impact of those diseases in combination with the other diagnoses on remand.

### 2.  Did the ALJ Rely on Clear and Convincing Reasons to Reject Dr. Sprague's Opinion?

On April 8, 2010, Dr. Sprague described Waldon's functional impairments as follows:

> Over the time that I treated Mr. Waldon he had significant functional impairment. This worsened over the time that I treated him. He was disabled when I first evaluated him in 2000, and became increasingly disabled over time. His symptoms include significant depression and anhedonia, severe neuropathy and pain which limit his endurance and ability to do many activities. Mr. Waldon has marked limitation in his concentration due to pain and fatigue and marked impairment in his social functioning. He would not be able to work in even a sedentary job and it is very likely his medical and mental functioning would likely worsen if he was in a competitive work environment. Although he is able to perform his activities of daily living, he would be unable to work in any capacity due to his medical and medication side effects. In my opinion he was unable to work since at least 6/30/02 and likely before that. His condition is not reversible and is likely to be progressive and I consider him fully and permanently disabled.

AR 852.

The ALJ considered Dr. Sprague's report and rejected it because he found that (1) Waldon was non-compliant with his diabetes treatment; (2) Dr. Sprague's pain reports were inconsistent with Waldon's physical activity; (3) Dr. Sprague's report of depression and PTSD were based on false information from Waldon; and (4) Dr. Sprague's determination that Waldon was disabled is an issue reserved to the Commissioner.  The court now evaluates whether those are clear and convincing reasons to reject Dr. Sprague's opinion as to Waldon's functional impairments.

#### a.  Waldon's Compliance with Diabetes Medications.

The ALJ pointed out that Dr. Sprague reported that Waldon had "very poorly controlled diabetes that required insulin."  AR 909.  The ALJ then pointed out that treatment notes from Dr. Garniewski, a clinical pharmacist that Dr. Sprague referred

Waldon to, said that Waldon "had been only taking 5mg Glyburide once a day, although it was prescribed to be taken twice a day.  Therefore, [Waldon's] diabetes was likely uncontrolled because of his non-compliance with treatment."  AR 909.  In support of this statement, the ALJ cites to Exhibit 14F, which is 472 pages long.

Looking directly at Dr. Garniewski's notes, it is inconclusive, at best, whether Waldon complied with his prescription regimen.  It actually appears that Waldon did comply with the regimen, and that the more plausible explanation for the "non-compliance" statement is a possible mistake in transcription as to the Glyburide dosage prescribed for Waldon:

- January 27, 1998:  Waldon prescribed to take 2.5 mg Glyburide orally once a day.  AR 875.

- December 22, 2000:  Dr. Sprague, in a consult request, noted that Waldon was taking 5 mg of Glyburide *daily* and "referred [him] to clinical pharmacy *for adjustment of diabetes medication*."  AR 511, 512 (emphasis added).

- January 4, 2001:  In making a further note regarding the consult request, a Christina Walters, who followed up on Dr. Sprague's referral, wrote that Waldon was currently taking 5 mg of Glyburide *twice* a day instead of the *once* a day noted by Dr. Sprague.  AR 514.

- January 17, 2001:  Pharmacist Dr. Garniewski, who took the referral and reviewed Ms. Walter's note, said that Waldon was taking 5 mg once a day "instead of twice a day as prescribed by [Dr. Sprague]".  Dr. Garniewski advised Waldon to start taking 5 mg of Glyburide twice a day, which he said he would start doing that day.  AR 515.

- January 29, 2001:  Dr. Garniewski noted Waldon was currently taking 5 mg Glyburide twice a day.  AR 821.

- March 8, 2001:  Dr. Garniewski noted Waldon was currently taking 5 mg Glyburide twice a day.  AR 811.

- April 16, 2001:  Dr. Garniewski noted that Waldon was "on glyburide for 9 years and is most likely not achieving any benefit at this time.  Will [discontinue] glyburide."  AR 806.

At no place in Dr. Sprague's notes did she state that Waldon was to take 5 mg of Glyburide twice a day.  Rather, a possible explanation for Dr. Garniewski's notation that Waldon had been prescribed 5 mg of Glyburide twice a day was that Christina Walters, who worked in the pharmacy department and followed up on the referral, mistakenly transcribed twice a day ("bid") instead of once a day ("qd").  Further, even if Dr. Sprague had prescribed Waldon to take 5 mg of Glyburide twice a day, the prescription would have come on or after December 22, 2000, which is less than a month before Waldon saw Dr. Garniewski, who adjusted the diabetes medication.  It does not seem likely, though, that Dr. Sprague would have changed Waldon's diabetes medication herself to twice a day because she referred Waldon to pharmacy expressly "for adjustment of diabetes medication."  AR 512.  Finally, Dr. Garniewski noted that Waldon was "resistant to discussing initiation of insulin."  AR 515.  If Waldon was trying to avoid taking insulin, he would have been motivated to comply with taking his oral diabetes medications.

Defendant also argues that on January 31, 1998, Dr. Kambhampati noted that Waldon was not compliant in taking his medications.  AR 870.  First, that statement misstates the record, as Dr. Kambhampati was only referring to "INH," a medication used to treat tuberculosis.  Second, in 1998 Waldon had only been prescribed to take 2.5 mg of Glyburide once a day, and as of 2001, Waldon had been more than compliant with that regimen.  Defendant's reliance on that statement by Dr. Kambhampati—which is taken out of context—does not support its argument that Waldon was non-compliant with his diabetes medication regimen.

In sum, the record shows that the fact that Waldon's diabetes was not controlled is more likely due to the lack of effectiveness of the medications as opposed to Waldon's alleged failure to follow his prescription regimen.  Based on the facts in the record, the ALJ's statement that "[Waldon's] diabetes was likely uncontrolled because of his non-compliance with treatment" is not a clear and convincing reason to reject Dr. Sprague's opinion.  *See Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998) (requiring ALJs to view the record as a whole and not parcel out evidence).

### b. Waldon's Reports of Pain.

The ALJ noted that there were several inconsistencies in Dr. Sprague's opinion, including Dr. Sprague's reports that Waldon suffered from pain "so severe that he took methadone for pain control" and had a distant history of a stroke.  AR 909.  The ALJ pointed out:

> [P]rogress notes dated January 17, 2001, report that [Waldon] was walking 1-1/2 to 2 hours every day; and on February 7, 2001, he indicated that he was taking walks twice a day.  This is not consistent with someone experiencing severe pain in his feet and does not take into account that this claimant has a substance dependence history that includes dependence on pain medications…

AR 909.

Waldon argues that his attempts at exercise complied with his doctor's recommendation that he walk to combat his diabetes and that his walks do not demonstrate an inconsistency with Dr. Sprague's pain evaluation.  Here is just a sampling from the record that shows that Waldon's doctors repeatedly ordered him to exercise:

- January 29, 2001: Waldon has been "walking 20 minutes twice a day [and] [h]as not missed any medication doses.  AR 821 (note by Dr. Garniewski).

- February 7, 2001:  "A daily routine of regular physical activity, as appropriate for this patient's physical condition, was encouraged.  The patient was given the opportunity to ask questions and was able to verbalize an understanding of the importance of regular exercise.  AR 819 (note by Licensed Vocation Nurse Christopher Theonnes).

- February 26, 2001:  "The patient is walking 20 minutes to half an hour twice a day.  Noted he get [sic] symptomatic when he walked for an hour-and-a-half at a time."  AR 817 (note by Dr. Sprague).

- May 30, 2001:  "…has been walking as much as he always did."  AR 800 (pharmacy note by Christina Walters).

- November 21, 2001: "Has not been walking as much. Walks about 20-30 minutes 3 days a week. Used to walk every day." Dr. Garniewski also "advised increase in walking during the holiday" season. AR 785-786 (note by Dr. Garniewski).

- March 14, 2003: "Walking a little." "Discussed the role of exercise in diabetes regimen." AR 727-728 (notes by Judy McEuen, Diabetes Nurse Educator).

Waldon's attempts to exercise do not demonstrate an inconsistency in Dr. Sprague's opinion. First, even though the ALJ complained that Waldon did not follow his doctor's orders regarding diabetes medications, he now faults Waldon for trying to comply with his doctor's orders to exercise. Second, just because Waldon walked does not mean he was without pain. In fact, Dr. Sprague knew that Waldon walked for exercise, and must have considered that in her April 8, 2010 opinion. Third, from 2001 to 2003, the length of exercise steadily and significantly decreased, and in fact the one and a half hour walk made Waldon "symptomatic."

It seems that in this case, the ALJ substituted his lay opinion that walking was inconsistent with Waldon's reported pain, which is not permitted. *See Tackett v. Apfel*, 180 F.3d 1094, 1102-03 (9th Cir. 1999) (finding that an ALJ may not substitute his or her lay opinion for those of medical professionals). The ALJ's noted "inconsistency" is therefore not a clear and convincing reason to reject Dr. Sprague's opinion.

### c. Waldon's PTSD.

The ALJ rejected Dr. Sprague's opinion for this reason:

> The doctor also reported that [Waldon] struggled with depression and PTSD symptoms since she had known him. However, this appears to be based on [Waldon's] false allegation of being drafted into the service during the Vietnam War and seeing combat; which the claimant subsequently admitted, including during his testimony at the hearing, was not true (Exhibit 14F, 16F and claimant testimony).

AR 909.

13

Waldon's medical records from the VA include several statements regarding Waldon's military experience.  These statements are all recited by the medical providers in their notes; it is unclear in some of the statements whether the provider learned the information directly from Waldon or if any of the information comes directly from military records.  The statements include:

- "Are you a Vietnam-era veteran?  Yes."  AR 659 (Jan. 23, 2004 Nursing Note by Deborah Vaughn).

- "Waldon is a … Coast Guard veteran who served during the Vietnam War."
  \***
  He "is a Vietnam veteran having served 14 months in country as an aviation machinist mate. He was drafted shortly after graduation from high school at age 18."
  \***
  "It should be noted that [Waldon] is a decorated Vietnam veteran, having received a head wound from shrapnel; he received a Purple Heart among other medals."  AR 688-690 (Oct. 8, 2003 Progress Note by Karen Inaba, Psychiatric Nurse Practitioner).

- "After receiving his high school diploma, he was drafted into the service by lottery (period of service = 8/6/73 to 8/8/77, honorable discharge).  He reported he had earned good grades, was student body president, and had planned to go to college but was drafted before he could get into college.  He decided to enter the Coast Guard after assurances he would not have to go to Vietnam if he joined this branch.  This was not correct, and Mr. Waldon was sent to Vietnam for 14 months where he worked on a PB4 small river boat and witnessed combat."  AR 815 (Feb. 28, 2001 Psychiatric Outpatient Note by Dr. Gonzales).

- "MILITARY HISTORY:  He served in the U.S. Coast Guard from 1972 to 1977.  His highest rank was an E5.  This is also the rank he was discharged at.  The patient saw combat during the Vietnam War and received a meritorious unit commendation with star."  AR 873 (Jan. 28, 1998 Discharge Summary by Dr. Yoshimoto).

Meanwhile, at the remand hearing, Waldon testified the following in response to questions from the ALJ:

14

Q: When did you go in the military?
A: In 19 – August of 1973.
Q: And when did you get out?
A: On August 01 1977.
Q: And what did you do in the military?
A: I was an aviation machinist mate [phonetic].
Q: And where did you serve?
A: I served in Sewick Bay [phonetic], the Philippines, also
    Panama.  And then in San Diego Air Station, San Diego.
    Costguard [*sic*] Air Station, San Diego.
Q: Now, tell me what was the last job you did?
A: The last job was with George G. Sharp…

AR 960.

Later, Waldon testified in response to further questions by the ALJ:

Q. What did the PTSD – what was the root of the PTSD?
A. Well…we would do the drug interdiction stuff with customs
    and…I fell over the side, and I just – I really thought I was
    dead[.]
***
A. I worked in conjunction … with US Customs while I was
    stationed here in San Diego [with the Coast Guard].  [W]e
    did drug interdiction…we went out and chased down drug
    people.
Q. At the boarder [*sic*]?
***
A. No, on the water.
***
Q. And is this, in your mind, was this the cause or the
    beginning of your PTSD, the memories of this?
A. Yeah, yeah.  Yes it was.

AR 983-984.

The record also includes several references to Waldon's PTSD and service during

the Vietnam War, including:

/ / /

/ / /

15

- "[Waldon] receives a VA pension. …Mr. Waldon reported experiencing depressed mood since his return from the Vietnam War in 1977.  He reported that … after the war he had 'lost his zest for living.'  … Among his past traumas are being shot, being stabbed, and two serious automobile accidents. …During the war he experienced enemy fire and witnessed the death of friends.  Mr. Waldon described symptoms consistent with PTSD: re-experiencing (nightmares, intrusive  memories, flashbacks when triggered), hypervigilance/hyperarousal (exaggerated startle response, checking his environment, quick to lose temper), and avoidance (memories or movies about war, funerals).  AR 813 (Feb. 28, 2001 Psychology Outpatient Note by Dr. Linda Gonzales).

- "Impression: PTSD exacerbation." AR 691 (Oct. 8, 2003 treatment note by Karen Inaba, Psychiatric Nurse Practitioner).

- "Provisional Diagnosis: ptsd Vietnam." AR 486 (Dec. 5, 2003 Mental Health Consult Request).

The ALJ says that these statements about PTSD made throughout the record are really just "false allegation[s] of being drafted into the service during the Vietnam War and seeing combat" because when the ALJ asked Waldon where he served in the military, Waldon did not expressly mention Vietnam.  AR 909, 960 ("I served in Sewick Bay[2] [phonetic], the Philippines, also Panama.  And then in San Diego Air Station, San Diego.  Costguard [*sic*] Air Station, San Diego").

The court is not convinced that Waldon's failure to expressly mention Vietnam— without any follow-up question by the ALJ—amounts to a "false allegation of being drafted into the service during the Vietnam War and seeing combat."  Such a statement would mean that Waldon's omission of the word "Vietnam" is tantamount to an express admission that he lied to all service providers over decades about his military experience,

_____

[2] The mention of "Sewick Bay" could reference "Subic Bay" in the Philippines, which served as a U.S. Naval Base until 1992.  "The Vietnam War was the period of peak activity" for Subic Bay.  *See* https://en.wikipedia.org/wiki/U.S._Naval_Base_Subic_Bay#The_Vietnam_War (last visited May 5, 2016).

16

which would call into question all the "depression and PTSD symptoms" that Dr. Sprague and others noted over the 10 years that he was her patient at the VA. *See* AR 909. Without any follow-up questioning or documentary evidence that Waldon did not serve during the Vietnam War, the court finds that the record does not support the ALJ's conclusion.

Further, the ALJ goes on to say that "during his testimony at the hearing, [Waldon] reported that he was not in Vietnam[.]" AR 911. This court has not identified any such testimony, and defense counsel has not pointed it out. It seems that the ALJ interprets Waldon's statement that he got PTSD when he fell in the water during a Coast Guard interdiction of drug smugglers as tantamount to Waldon stating that he lied about service during the Vietnam War. *See* AR 911. Again, the court does not see any factual support for the ALJ's conclusion here.

### d. Dr. Sprague's Disability Determination.

The ALJ again rejects Dr. Sprague's opinion that Waldon is disabled because it is not a medical finding but an issue reserved to the Commissioner. AR 910. The court already rejected this rationale in R&R 1:

> The ALJ rejected the "statements that a claimant is 'disabled', 'unable to work' [and] can or cannot perform a past job" because they "are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein and in the Dictionary of Occupational Titles." AR 27. First, this court finds that Dr. Sprague was not trying to make an administrative decision but rather was offering her opinion. She couched her statements with, "In my opinion, he was unable to work . . ." and "I consider him fully and permanently disabled," and therefore, she was not trying to substitute in her opinion for a definitive administrative decision. AR 852.
>
> Second, the ALJ's rejection of her "administrative opinion" is not supported by specific and legitimate reasons, and cannot serve to reject all of Dr. Sprague's clinical findings and evidence as to the nature and severity of Waldon's impairments.

17

> See *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)
> (finding the ALJ could not reject the physicians'
> uncontroverted opinion on the ultimate issue of disability
> without citing to clear and convincing reasons).  The court
> notes that the ALJ's rejection of Dr. Sprague's conclusion
> simply highlights that the determination of whether Waldon is
> "disabled" is left to the Commissioner.  *See* 20 C.F.R.
> 404.1527(d)(2).

R&R 1, p.10.

For the same reasons stated above, the court again rejects the ALJ's statement that Dr. Sprague should not have opined on the ultimate question of Waldon's disability because it is not a clear and convincing reason to reject Dr. Sprague's opinion.

## B. **Is There Substantial Evidence to Support the ALJ's Decision to Reject Waldon's Testimony?**

### 1. **Legal Standard for Rejecting Claimant's Testimony.**

An ALJ must determine the extent to which a claimant's symptoms "can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [those] symptoms affect [the claimant's] ability to work." 20 C.F.R. § 404.1529(a).  But those statements alone cannot be decisive on a disability claim.  42 U.S.C. § 423(d)(5)(A) ("[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability"); 20 C.F.R. § 404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled").

A claimant's subjective symptoms must be considered in a disability evaluation. 20 C.F.R. § 404.1529; *Smolen v. Chater*, 80 F.3d 1273, 1291 (9th Cir. 1996).  In deciding whether to credit a claimant's testimony about subjective symptoms or limitations, the ALJ must engage in a two-step analysis. *Batson*, 359 F.3d at 1195; *Smolen*, 80 F.3d at 1281.  Under the first step, the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce pain or other symptoms. *Batson*, 359 F.3d at 1195; *Smolen*, 80 F.3d at 1281.  If this test is satisfied,

and there is no affirmative evidence that the claimant is malingering, then the ALJ must determine the credibility of the claimant's subjective complaints.

In assessing the credibility of the claimant's subjective complaints, the ALJ may consider such factors as the claimant's reputation for truthfulness, any inconsistencies in the claimant's statements, and the claimant's daily activities. *Tonapetyan*, 242 F.3d at 1148; *Smolen*, 80 F.3d at 1284; *see* Social Security Ruling 96-7p (credibility findings "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements"); *Bunnell v. Sullivan*, 947 F.2d 341, 345-346 (9th Cir. 1991) (en banc) (ALJ cannot "arbitrarily discredit a claimant's testimony regarding pain" (internal quotations omitted)). The ALJ may reject the claimant's testimony about the severity of symptoms as long as he gives specific, convincing reasons for doing so. *Batson*, 359 F.3d at 1195; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834. If the ALJ's interpretation of a claimant's testimony is reasonable and supported by substantial evidence, courts may not "second-guess it." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

### 2. Did the ALJ Cite Clear and Convincing Reasons to Find Waldon's Testimony Not Credible For a Second Time?

Because there is objective medical evidence about the underlying impairments, the ALJ had to evaluate Waldon's subjective symptoms or limitations. The ALJ cites these nine reasons for finding that Waldon is not credible in describing his pain and limitations.

### a. Activities of Daily Living.

Because Dr. Sprague stated that Waldon could perform his activities of daily living, the ALJ finds Waldon not credible. But the full context of what Dr. Sprague said reads:

/ / /

/ / /

> [Waldon] would not be able to work in even a sedentary job
> and it is very likely his medical and mental functioning would
> likely worsen if he was in a competitive work environment.
> Although he is able to perform his activities of daily living, he
> would be unable to work in any capacity due to his medical and
> medication side effects.

AR 852.  Thus, even though Waldon can perform his activities of daily living, his treating physician opined that he has several other limitations that affect his ability to function in a work environment.  The ALJ does not point to substantial evidence in the record to negate this finding.  Therefore, the court finds it is not a clear and convincing reason to find Waldon not credible.

### b.  Discontinuance of Alcohol and Drug Treatment.

The ALJ stated that Waldon discontinued his drug and alcohol rehabilitation in October 1997, and found this an independent reason to show he was not credible.  AR 910.  In support, he said "there were no allowable reasons offered for discontinuing his alcohol and drug treatment regime[.]"  AR 910.  But Waldon eventually continued with the rehabilitation and was reported to be in remission from drug abuse prior to his date last insured.  AR 814.  Therefore, the court does not find this to be a clear and convincing reason to find Waldon not credible.

### c.  Waldon's Statements on Vietnam.

The ALJ rejected Waldon's testimony because he found that he made inconsistent statements about his military service.  AR 910-911.  As already explained, the court does not find substantial evidence in the record to support this assertion.  This is not a clear and convincing reason to find Waldon not credible.

### d.  Cardiac Catherization.

The ALJ finds that Waldon was not credible because he did not show up for a cardiac catherization on June 25, 1999, so the doctor opined that Waldon did not have an acute illness.  AR 911.  But without further evidence as to what Waldon actually reported as his symptoms and if it was reasonable to schedule a cardiac catherization, this does not

constitute substantial evidence to support the ALJ's determination that this was a reason to find Waldon not credible.

### e. Progress Notes re: Alcohol Use.

The ALJ finds Waldon not credible because while on a medical visit to the VA on December 1, 2000, Waldon purportedly said, "alcohol products *were* not used." AR 911 (emphasis added). The ALJ then explains that this is inconsistent with what Waldon testified to at the remand hearing when he explained he had a history with alcohol and drug abuse. AR 911. But the actual progress note from December 1, 2000 says, "Patient states that alcohol products *are* not used." AR 836 (emphasis added). That statement is quite different from what the ALJ quotes and more likely means that Waldon was not using alcohol *at that time*. The court finds that the ALJ's twisting of Waldon's words and using that misquote to imply that Waldon lied to the medical provider by saying he never abused alcohol is not a clear and convincing reason to find Waldon not credible.

### f. Waldon's Exercise Habits.

The ALJ found that Waldon's exercise report did not correspond to his reports of debilitating pain. AR 911. As already explained, the court does not find substantial evidence to support this assertion. Waldon was following doctors' orders by exercising, and his rate of exercise steadily decreased from 2001 to 2003. This is not a clear and convincing reason to find Waldon not credible.

### g. Diabetes Medication Regimen.

The ALJ found Waldon not credible because he did not follow his diabetes medication regimen. AR 911. As already explained, the court does not find substantial evidence in the record to support this assertion. Therefore, it is not a clear and convincing reason to find Waldon not credible.

### h. Waldon's Limitations.

The ALJ says that no physician ever opined that Waldon's ailments met or equaled a listing. AR 911. But Dr. Sprague described Waldon as having "marked limitation in his concentration due to pain and fatigue and marked impairment in his social

21

functioning."  AR 852.  A marked limitation satisfies the criteria of the "Listing of Impairments."  *See* 20 C.F.R. § 404(p), Appendix 1 (Listing of Impairments) § 12.00 Mental Disorders ("We assess functional limitations using the four criteria in paragraph B of the listings: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.").  Based on the content of the opinion of Dr. Sprague, the court finds this is not a clear and convincing reason to reject Waldon's testimony.

### i.   *Impairments and Pain.*

The ALJ found that the objective medical evidence does not support a finding of disability.  AR 911.  But the rejection of a claimant's testimony based on a lack of objective evidence is legally insufficient because it requires the consideration of "excess pain," and not simply the degree of pain established by the objective medical evidence. *Bunnell*, 947 F.2d at 345; 20 C.F.R. § 404.1529(c)(2) ("we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements").  Accordingly, the court does not find this to be a clear and convincing reason to find Waldon not credible.

### III.   <u>CONCLUSION</u>

A determination whether to reverse and award benefits or reverse and remand for further administrative proceedings is within the Court's discretion.  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  A finding of disability is warranted when further proceedings before the Commissioner on a fully-developed issue would be futile. *Smolenr*, 80 F.3d at 1292.  Having already been remanded for a second set of proceedings, and now finding again that the record does not support the ALJ's second-identified set of "clear and convincing" reasons to reject the opinion of Dr. Sprague who treated Waldon for 10 years, the court finds that a second remand would be futile.  In light of the above discussion, the court concludes that the ALJ erred in rejecting the opinion of treating physician Dr. Sprague and erred in not finding Waldon to be credible.

*See Lester*, 81 F.3d at 829-830 (finding a failure to properly consider the treating opinion is reversible error).

Accordingly, the court finds that Waldon is entitled to disability benefits as of the date of his eligibility.  Based on its review of the record and consideration of the briefs, the court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **GRANTED** and Defendant's Cross-Motion for Summary Judgment be **DENIED**.  This court **RECOMMENDS** that final decision of the Commissioner be **REVERSED** and **REMANDED** to the Social Security Administration for the calculation and award of benefits.

This Report and Recommendation is submitted to the United States district judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).  Any party may file written objections with the court and serve a copy on all parties on or before **May 24, 2016**. The document should be captioned "Objections to Report and Recommendation."

Any response to the objections shall be filed and served on or before **June 1, 2016**. The parties are advised that any failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *Baxter v. Sullivan,* 923 F.2d 1391, 1394 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  May 10, 2016

_____

Hon. Nita L. Stormes
United States Magistrate Judge